<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4     UNITED STATES OF AMERICA          )
                                         )
 5                                       )
       vs.                               )
 6                                       )  No. 13-cr-10238-DPW
                                         )
 7     DIAS KADYRBAYEV (1),              )
       AZAMAT TAZHAYAKOV (2)             )
 8     AND ROBEL KIDANE PHILLIPOS (3),   )
                                         )
 9                       Defendants.     )

10

11     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

12

13                          MOTIONS HEARING

14

15

16            John Joseph Moakley United States Courthouse
                          Courtroom No. 1
17                        One Courthouse Way
                          Boston, MA 02210
18                        March 10, 2014
                             9:05 a.m.
19

20

21

                      Brenda K. Hancock, RMR, CRR
22                       Official Court Reporter
              John Joseph Moakley United States Courthouse
23                        One Courthouse Way
                          Boston, MA 02210
24                         (617)439-3214

25
</pre>

```
 1   APPEARANCES:

 2        U.S. ATTORNEY'S OFFICE
          By:  AUSA B. Stephanie Siegmann
 3             AUSA John A. Capin
          1 Courthouse Way
 4        Suite 9200
          Boston, MA 02210
 5        On behalf of the United States of America.

 6

          ROBERT G. STAHL, ESQ
 7        220 St. Paul St.
          Westfield, NJ 07090
 8        On behalf of the Defendant Dias Kadyrbayev

 9

          LAW OFFICE OF BUKH & ASSOCIATES PLLC
10        By:  Nicholas Wooldridge, Esq.
          1123 Avenue Z
11        Brooklyn, NY 11235
          On behalf of the Defendant Azamat Tazhayakov.

12

13        DEMISSIE & CHURCH
          By:  Derege B. Demissie, Esq.
14             Susan B. Church, Esq.
          929 Massachusetts Avenue
15        Suite 01
          Cambridge, MA 02139
16        On behalf of the Defendant Robel Kidane Phillipos.

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S:

2          THE CLERK:  All rise.

3      (The Honorable Court entered the courtroom at 9:05 a.m.)

4          THE CLERK:  This Honorable Court is now in session.

5  You may be seated.

6          This is Criminal Action 13-10238, The United States

7  versus Dias Kadyrbayev, Azamat Tazhayakov and Robel Phillops.

8          Will counsel please identify themselves for the

9  record.

10         MS. SIEGMANN:  Good morning, your Honor.  Stephanie

11  Siegmann for the United States.

12         MR. CAPIN:  Good morning, your Honor.  John Capin as

13  well on behalf of the United States.

14         MR. STAHL:  Good morning, your Honor.  Robert Stahl on

15  behalf of Dias Kadyrbayev.

16         MR. WOOLDRIDGE:  Nicholas Wooldridge on behalf of

17  Azamat Tazhayakov, your Honor.

18         MR. DEMISSIE:  Good morning, your Honor.  Derege

19  Demissie for Robel Phillipos.

20         MS. CHURCH:  And Susan Church for Robel Phillipos.

21         THE COURT:  Well, I have the Defendants' Joint Motion

22  to Compel Discovery, and I have got the Opposition filed by the

23  Government.  I do not think there are any other written

24  materials before me here.

25         MS. SIEGMANN:  Your Honor, the Government also filed a

1  Motion for Leave to File -- our opposition was in excess of 20

2  pages, and we had some exhibits that are attached.  That was

3  it, your Honor.

4          THE COURT:  Right, I have all of those.

5          So, I realize that the discovery process is

6  interactive and, consequently, may have been affected by events

7  subsequent to the Defendants' Joint Motion to Compel the

8  Discovery, but I think the best thing to do or the most

9  efficient thing to do is go through the requests to see what

10  remains, if anything, of these requests.

11          Going through, apart from the introductory discussion

12  of discovery responsibilities, I think the first page in which

13  we deal with specific requests are Requests 1 and 2, which have

14  to do with oral statements of the defendants.

15          Is there anything left in this now?  We had the back

16  and forth.

17          MR. STAHL:  Briefly, your Honor, our issue, and it is

18  intertwined as well with the request regarding other agencies

19  involved, is that -- to preface this, there was a Joint Task

20  Force, a JTTF, Joint Terrorism Task Force operation on

21  April 19th when the FBI and others apparently thought that

22  Jahar might be at the Carriage Drive address, which turned out

23  not to be true, but they responded en masse, and there were

24  SWAT Teams, hostage rescue teams, state, local, federal

25  agencies involved, multiple federal agencies, in our

1    understanding, and from the photos from the scene that were

2    published in the newspaper there were dozens and dozens of

3    officers.

4              After the individuals were ordered out at gunpoint and

5    stripped in public view and then handcuffed, they were then

6    placed in the back of patrol cars and left there for several

7    hours.  And the question that we are trying to get to is what

8    other agencies were involved, and are there any notes or log

9    entries or radio calls --

10             THE COURT:  The Government has responded.  They say,

11   "No."  You see, the problem is they say, "No."  If it turns out

12   that they are wrong, it will not go well for them, I can assure

13   you.  But I cannot spend my time, and you should not be

14   spending your time, trying to conjure up circumstances that

15   they claim are not available here.

16             The point with statements is they either use them or

17   they do not.  They apparently have statements that they want to

18   use.  You have got those statements.

19             So, I am not sure that this amounts to much.  The only

20   thing that is of concern to me, I guess, is the suggestion that

21   Mr. Kadyrbayev was offered a statement to sign and declined to

22   sign it, and it has not been turned over.  They say it does not

23   exist.  You say it does.  I do not really know what to make of

24   that, unless you want to provide evidence, and I emphasize

25   *evidence*.  It would have be to under oath.  And then we have

1    got an evidentiary issue, I suppose.

2         MR. STAHL:  There were other witnesses, too, that on

3    April 20th he was presented a statement to sign.  He started to

4    say, "That's not what I said, that's not what I meant."  An

5    agent started to cross things out, and eventually Kadyrbayev

6    said, "I'm not signing anything."  So, there was something

7    presented.

8         THE COURT:  Well, that is what, apparently, he says

9    and others will.  The Government says it does not exist.  At

10   this point all I have is talk back and forth between the

11   parties.  It is clearly a statement, if it exists, and it is

12   clearly something the Government has to turn over, if it

13   exists.  The question is whether it exists, whether that took

14   place.

15        Now, if you want to tee that up, I guess we can tee

16   that up in some fashion, but that is the only thing in here

17   that I see as problematic.

18        MR. STAHL:  So, if I can just give an example.  So,

19   what we're talking about is much of this case, in my opinion,

20   rises and falls on the suppression motions and whether these

21   alleged statements come in.

22        THE COURT:  Right.

23        MR. STAHL:  So, we are entitled to and obligated to

24   explore the surrounding circumstances of what went on on

25   April 19th and April 20th to obtain their alleged consent to

1   talk, consent to search, signing of Miranda waivers, all of
2   that.

3          Because what you have is the Government taking a
4   position -- and this will come out as we get towards the
5   suppression motions, but it's important here in discovery --
6   that they were not under arrest on April 19th, despite being
7   held in custody, despite being handcuffed for four hours.

8          THE COURT:  But the Government says that they are not
9   going to use those statements.  We have to deal with the
10  statements that the Government is going to use.  That is what
11  the Motion to Suppress is about.

12         MR. STAHL:  But, Judge, if those circumstances are
13  surrounding that they are detained, that goes to whether the
14  consent was voluntary, whether they should have been brought
15  before a Magistrate.

16         THE COURT:  It may or may not, but right now all I
17  know is a kind of generalized statement that there is going to
18  be a Motion to Suppress.  I have made clear, and I will make
19  clear again, that it is going to be the obligations of the
20  defendants to file evidence that justifies a hearing, and the
21  order of proof in that hearing is going to be I hear from the
22  defendants' evidence first.

23         Because my experience in this area is that -- I am not
24  suggesting that any of counsel would do something like this --
25  but that Motions to Suppress are filed as exercises in

1    obtaining discovery beyond what they are entitled to.

2         So, in order to frame the issues I have got to have

3    motions that are supported by affidavits, and they will be

4    tested in the context of the Motion to Suppress with the order

5    of proof being that the defendants go first, defendants' proof

6    goes first.

7         Now, is that going to develop additional information?

8    It may.  It may lead to the need for further discovery.  It may

9    lead to the development of additional testimony by the

10   Government.  But, in any event, at *this* stage what I have is

11   the Government says they are not going to use it, anything

12   before the Mirandized statements, I am told.  So, that is the

13   focus of what you are entitled to here.  I do not see anything

14   else left in Requests 1 and 2 at this time.

15        MR. STAHL:  I appreciate what you're saying.  The

16   circumstances surrounding this whole event are subject to

17   discovery.  And just last week, before we filed this motion,

18   because we were pressing for discovery and had the telephonic

19   conference, we got the logs of the officers that transported

20   the two individuals from Carriage Drive to the State Police

21   Barracks where the logs list them as, "We're bringing in the

22   two prisoners."

23        THE COURT:  But, you see, you have read logs, and so

24   have I.  New Bedford Police may or may not report accurately

25   what was going on, but that does not decide the question of

1    whether or not they were in custody at that time.  And, in

2    fact, I am not sure that I am required to get to the question

3    of custody for the Motion to Suppress.  I certainly do not know

4    that now, because nothing that they said before they were

5    Mirandized is going to be used.

6          Now, you may say, and I gather you intend to, that,

7    well, they were so conditioned, I guess that would be a way of

8    saying it, by the time that the Miranda warnings were given

9    that we cannot treat those Miranda warnings as eliciting

10   knowing and voluntary waivers.  Maybe that is true.  I do not

11   know.  But the mere assertion of it without affidavits, without

12   testimony, is not enough to permit excursions into things that

13   are traditionally beyond pretrial discovery.

14         MR. STAHL:  And because we received videos after our

15   conference from the State Police --

16         THE COURT:  Let me just pause.  I do not mean to keep

17   interrupting, but I do want to frame the issue, because we have

18   got a lot of stuff to go over.  I do not know whether it is

19   realized here, but there is always the danger of no good deed

20   goes unpunished in which the Government turns over lots of

21   stuff, and then that is treated as an admission.  I do not

22   treat it as an admission.  All I am looking at is whether or

23   not the Government has complied with their responsibilities of

24   discovery and also the directives that I may give on the

25   orderly process of the trial.

1          So far as I understand with respect to Requests No. 1

2     and 2, with the exception of this potential what I will call

3     "aborted statement," they have, and I have no evidence

4     otherwise.  If someone wants to press the issue, they will give

5     me evidence.  Not argument, evidence.

6          MR. STAHL:  Well, Judge, my understanding is that we

7     are presenting legal argument as to why we are entitled to

8     certain discovery so that we can be prepared for what is, I

9     believe, a very tight trial schedule and a Motion to Suppress

10    schedule.

11         THE COURT:  Oh, it is not tight.  I have gone through

12    this and realize now what I thought was the case is the case,

13    that it is not a tight trial schedule.  This case is contained

14    and easily understood.  I do see a lot of spinning of wheels,

15    which suggests inefficiency in preparation or pursuit of

16    extraneous matters, which suggests that time is being spent

17    that is not fruitful.

18         But all of that having been said, there is nothing

19    tight about this.  This is truly not a particularly complex

20    case.  It is in a charged setting, but it is not a particularly

21    complex case.

22         MR. STAHL:  Judge, I would disagree with we're

23    spinning our wheels.  Until we press for things, which we just

24    got in the last couple of days -- we now have a much fuller

25    picture of what's going on.  We just got information returned

1    that the Government got from Russian authorities that the

2    Government intends to use in its case in chief, and there are

3    scores, thousands of pages, that still need to be translated

4    that the Government intends to use portions of.  So, we're not

5    talking about a fishing expedition and to look at the

6    relationship over the last two years.  We are talking about the

7    relevant time period.

8              THE COURT:  That is not before me here.  What is

9    before me suggests to me that the discovery requests are

10   overbroad and have not focused directly on the issues that are

11   necessary for resolution.  But, of course, I am listening very

12   carefully to determine whether there is something that is

13   problematic.  I have not heard anything yet that is

14   problematic, but I want to go request by request.

15             So, I think I have heard everything that you have to

16   say about that, Mr. Stahl.

17             Mr. Wooldridge.

18             MR. WOOLDRIDGE:  I will be really quick, your Honor.

19   I think you kind of hit it when you said that the

20   circumstances -- if we are making an argument about the

21   circumstances leading up to the time when the defendants were

22   allegedly Mirandized, and I think that is what the defendants

23   are looking for, and I think what your Honor said is you want

24   some type of evidence to see if what we're requesting is

25   relevant.  So, if your Honor is asking us to put forth an

1    affidavit from the defendants as to what occurred, and then our

2    request is basically material to that request in the sense that

3    it would corroborate what the defendants are saying -- is that

4    what your Honor is saying?

5         THE COURT:  No.  I am saying you have not done what

6    you are required to do, which is to show me that there is

7    something here.  I am not going to dictate to you how you do

8    that.  I have outlined what is the ordinary structure for this

9    sort of thing, which is, you get discovery requests, you look

10    at them, you decide whether or not there is an assertion of

11    compliance.  There is, at least as to 1 and 2.  And then you

12    say, well, all right, so how are we going to tee this up for

13    evidentiary purposes?

14         I do not know, but my guess is that the proof of the

15    pudding will be at the Motion to Suppress, that I will look at

16    whatever is filed to support a hearing on it, and right now I

17    do not even have that, and I will decide whether or not there

18    will be a hearing or whether or not the affidavits do not rise

19    to the level of justifying a hearing.  But assuming that there

20    is a hearing, and I see this context enough to suggest that it

21    is probably going to be a hearing, then we will hear from

22    whatever you have by way of evidence in the case.

23         Now, I take it that you are going to say, "Well, gee,

24    how can we put on evidence when you would not even give us

25    discovery?"  And I will look at that at the time.

1    On the other hand, frankly, in Motions to Suppress the

2    key issue is how the defendants responded to the circumstances

3    that elicited the statements.  Generally you find that out when

4    you hear the testimony of the defendants.  But I am not telling

5    you how you put on your case.  You may have third parties who

6    will comment on what was said or the circumstances under which

7    it was said, but that is where I am going to get it, I suspect,

8    on this.

9    MR. WOOLDRIDGE:  Okay, your Honor.

10   THE COURT:  But in terms of what they say they have

11   done for Request Nos. 1 and 2, with the exception of this one

12   particular dispute, I think, unless there is some other dispute

13   I am missing, they say they have.  You say you are not sure

14   they have, because, "We do not know what they have," but the

15   burden rests on you to provide me with something that justifies

16   some further extraordinary action, and my expectation is it is

17   going to arise in the context of the Motion to Suppress and the

18   hearing there.

19   MR. WOOLDRIDGE:  Understood.

20   THE COURT:  Is there anything else on 1 and 2?

21   MR. DEMISSIE:  Nothing from us, Judge.

22   THE COURT:  Then we turn to 4 and 5, which is on Page

23   12, and this asks for responses and calls for citizens and

24   evidence of individuals who may or may not have been able to

25   make the identification of Mr. Tsarnaev.  I do not see this as

1    relevant in any way or likely to lead to anything relevant in

2    any way.  What other people may or may not have been able to do

3    does not bear on the core issues in this case.

4         I say the case is not complex.  Every case has its

5    challenges and so on, but I think there are really four

6    questions in this case:  What did the defendants know, when did

7    they know it, what did they do with that knowledge, and did

8    they answer questions truthfully in light of the knowledge that

9    they had?  Those are the issues, I think.  I do not see

10   anything else.  That someone may have called in to law

11   enforcement does not affect that in the slightest.

12        So, unless there is something else that bears on

13   discussion on 4 and 5 --

14        MR. WOOLDRIDGE:  Sure, your Honor.  One of the reasons

15   why we raised this issue is because during the deposition of

16   the Government's witness, and some of the materials that they

17   turned over, there was questions posed about that the

18   Government believed that the defendants knew that the suspected

19   bomber was their friend Jahar and failed to call the police.

20   So, one of the things that we wanted to see is who did call the

21   police that knew Jahar, and we don't believe that there was

22   anybody that called the police that knew Jahar.

23        But now, I mean, with the Government's response, now

24   they are saying that that evidence is not relevant to the case.

25   So, I mean, if the Government is not going to be putting forth

1    that kind of evidence at trial to say that they never called

2    the police and that's not relevant, then maybe the issue is

3    moot.

4            THE COURT:  That seems somewhat confused.  The

5    Government has to put on a case to use the outline I have of

6    what did they know, when did they know it.  I am not sure that

7    obstruction is not raising a hue and cry.  I do not know if the

8    Government will make that charge, but it is certainly not that

9    somebody else did not raise the hue and cry.  This has to do

10   with these defendants, what they knew, not what the general

11   public may have known, not what other people may have done or

12   not done.

13           This goes back to this question of saying it is a

14   tight schedule.  If you are spending time on this you are

15   putting pressure on your schedule, because this really has very

16   little, if anything, to do with the case, except that it is the

17   general topic.  So, if that is the argument for it, and unless

18   there is something more, I think we can move on.

19           MR. WOOLDRIDGE:  That's fine, your Honor.  We can move

20   on.

21           MR. DEMISSIE:  Your Honor, on this issue I just want

22   to say something.

23           THE COURT:  Sure.

24           MR. DEMISSIE:  I think, your Honor, one of the

25   evidence that we expect the Government to present to be a very

1    visual picture that was televised of the two possible suspects,

2    and the timing of when people realized who these people were,

3    even people who knew them very well, would be a crucial element

4    of --

5         THE COURT:  Why would it?  The question is these

6    defendants, not somebody else, not other people who knew them,

7    not other people who had other observations to make about them.

8    It is these defendants.  Either the Government can prove it or

9    it cannot.

10        MR. DEMISSIE:  I understand.  Assume, for example, a

11   defendant says, "Well, I looked at the picture.  It didn't look

12   like that person, so I didn't realize it was him."  To the

13   extent that other people who knew the person just as well felt

14   the same way --

15        THE COURT:  I would never in a million years let that

16   evidence in.  The failure of identification by somebody else?

17   No.  This is what I mean about this kind of spinning of wheels.

18   This is not relevant, nor is it likely to lead to relevant

19   evidence.  It is just as simple as that.

20        If you are saying, "Well, what we would like to do is

21   go have a collection of people out on the highways and byways

22   who looked at this picture and said, 'I could not recognize

23   him,'" it is not coming in.

24        MR. DEMISSIE:  Your Honor, I think I was just -- I was

25   about to finish my thought, which was I wasn't suggesting that

1    we would put on any evidence through witnesses that so-and-so

2    knew Jahar and did not call the police.  That's not what I was

3    talking about.  What I was referring to is, for example, an FBI

4    Agent takes the stand and says he realized it was Jahar and did

5    not call the police.

6             THE COURT:  I cannot imagine me letting that in

7    either.  Just a moment.  If an FBI agent tried to testify that

8    way it would not be admissible.

9             MR. DEMISSIE:  Based on the statement of the person.

10   If a statement --

11            THE COURT:  Of what person?

12            MR. DEMISSIE:  The defendant.

13            THE COURT:  Oh, the defendants.  That is a different

14   issue.  That is the whole point.

15            MR. DEMISSIE:  Exactly.

16            THE COURT:  We are talking about the defendants, not

17   about other people --

18            MR. DEMISSIE:  I understand.

19            THE COURT:  -- and 4 and 5 deals with other people.

20            MR. DEMISSIE:  I understand.  But what I am saying is

21   if testimony of that nature comes in, I am at that point, I

22   would argue, allowed to ask the officer if that was actually

23   consistent with how other people who knew this person reacted

24   as well.

25            THE COURT:  I cannot imagine that.  We are talking

1     about a statement of a defendant.  He testifies to a statement

2     of a defendant that says, I recognized him, or did not

3     recognize him.  I would not let the Government say, Is that

4     consistent with anybody who really knows him?  And I certainly

5     would not let you get into the question of that is not

6     consistent with or that is consistent with everybody else out

7     there.  This is really far afield, to the degree it is even in

8     the field.  So, unless there is a better argument about this, I

9     have not heard any yet --

10         MR. DEMISSIE:  It goes to the knowledge of these

11    individuals when they went to the room and the intent of the

12    individuals when they allegedly did what they did in the room.

13    And I think to the extent that the Government would argue they

14    knew this individual was involved in the bombing by the time

15    when they went in, the fact that other people who knew him very

16    well did not realize it was, in fact, him is relevant.

17         THE COURT:  Well, we disagree.  I mean, to the degree

18    that that even states an evidentiary issue, we disagree.

19         MR. DEMISSIE:  Thank you, your Honor.

20         THE COURT:  Anything else on 4 and 5?

21         MS. CHURCH:  I just might as well add a comment to our

22    losing leading charge here.  I certainly can picture the

23    Government during trial showing the photos that were first

24    released and then showing the photos, clearer photos of them,

25    and then arguing to the jury, Does it make any sense that any

1    of these defendants claimed in their interviews that they did

2    not recognize that that was someone that they knew for the past

3    year or so?  And to that extent I think it's relevant because

4    Jahar, in particular, has been a member of the community for

5    over 10 years as a citizen.  There have been publications where

6    his own high school wrestling coach and the coach's son, who

7    were very close to Jahar, did not recognize him.  His own

8    roommate did not recognize him.

9           THE COURT:  Let us take that in a concrete fashion,

10   not in this metaphysical discussion.  If you offered the

11   testimony of the wrestling coach would that admissible?

12          MR. STAHL:  I am not talking about offering the

13   testimony of other witnesses, but certainly through an agent,

14   and then there will be testimony about statements, perhaps, if

15   they are not suppressed.  And then we will have the Government

16   arguing to the jury, I can't imagine it not being argued, that

17   it makes no sense, it defies logic, that someone that's known

18   this individual, that's hung out with him, partied with him,

19   smoked marijuana with him, bought marijuana from him, did not

20   recognize him.

21          But the Government has in its possession and knowledge

22   that many, many people that knew him far longer and far better

23   than these defendants did not recognize him and did not call

24   him either.  So, therefore, they are making an argument to the

25   jury that we would not be able to refute because we could not

1    have the discovery.

2         THE COURT:  I guess there are two parts to that.  Of

3    course you can.  You have told me that you have evidence of

4    other persons who you say knew him better than these

5    defendants.  So, you are not in a position of not being able to

6    do that with specific people.

7         But, more fundamentally, I cannot imagine my letting

8    an argument like that be made to the jury.  I keep going back

9    to this.  This is not speculation.  This is what did they know

10   at the time, *they* know at the time.  If it is supported by

11   statements of the defendants, what they knew at the time, well,

12   that will be perhaps important evidence in the case.  But we

13   are not doing a kind of poll of the community or even the

14   community that knows Mr. Tsarnaev.

15        I will take as long as it takes to hear whatever

16   argument you have to make, but I hope that the arguments have a

17   little bit more rigor to them than I have heard so far.

18        MR. STAHL:  Well, I guess some of them are in a vacuum

19   yet until we get to some hearings.  When your Honor says you

20   cannot imagine letting the Government argue that, that is one

21   of the standard arguments about the credibility of the

22   defendant and whether his statement is truthful in certain

23   respects or not truthful in certain respects.

24        THE COURT:  I cannot imagine letting the Government

25   say, "Anybody in the community would recognize him," which is

1    what you are talking about, that there are people in the

2    community who did not recognize him.  That is what I am talking

3    about.

4         So, this is really at the level of unballasted

5    speculation, although I think I have outlined that I am going

6    to keep the Government to its proof, and I expect that the

7    defendants will fashion their defense or their approach with

8    the recognition that the Government is going to be kept to its

9    proof.

10        MR. STAHL:  Thank you.

11        THE COURT:  I am reluctant to say anything more on 4

12   and 5, but is there anything more on 4 and 5 that I have not

13   heard so far?

14        Not hearing anything, let us move on.  As to that, I

15   see no reason to make an order to compel, just as I do not see

16   any reason to make an order to compel with respect to 1 and 2,

17   as I have earlier dealt with.

18        Now I come to 6, and this is communications between

19   Mr. Tsarnaev and third parties and between Mr. Tsarnaev and the

20   defendants.

21        Now, as I understand it from the Government's

22   response, they have provided everything that they have having

23   to do with communications between Mr. Tsarnaev and the

24   defendants.  Am I correct about that?

25        MS. SIEGMANN:  Yes, your Honor, you're correct.

1          THE COURT:  So, this third-party stuff, I am not sure

2     I understand what that is about.  First, I do not understand

3     the entitlement, but, second, I do not know what it is about.

4          So, what are you looking for here, that he had

5     communications with other people who are not on trial in this

6     case?

7          MR. STAHL:  Your Honor, my focus in this request is

8     more towards at the defendants on trial here, and we have

9     recently received information from the Government that they

10    have no other communications, and then they drop a sentence

11    about Tsarnaev destroyed his phone before his arrest.  Well, in

12    many prior cases that I have had you were able to get text

13    messages for a certain period of time from the carrier, and I

14    am sure that that was done.

15         THE COURT:  You have got the subpoena power.  You can

16    do it, too.

17         MR. STAHL:  Well, to the extent the Government has it

18    in its possession.

19         THE COURT:  Well, then we deal with the question of

20    whether or not they are obligated to turn it over to you, not

21    whether or not they have it in their possession, and I,

22    frankly, do not understand what the relevance is of it.

23         MR. STAHL:  I'm talking about --

24         THE COURT:  The third party --

25         MR. STAHL:  No, I'm talking about just our defense.  I

1    just wanted a representation from the Government, because maybe

2    I'm misreading it, that they then say they were not able to

3    retrieve any other text messages, and I find that difficult to

4    believe, based upon the nature and scope of this investigation

5    and type of crime.

6              THE COURT:  What are you looking for?  Are you looking

7    for additional communications between Mr. Tsarnaev and these

8    defendants?

9              MR. STAHL:  And the defendants.

10             THE COURT:  Okay.  Let's stop at that.

11             You say you do not have any others that you have not

12   turned over.

13             MS. SIEGMANN:  We've produced everything we have, your

14   Honor.

15             THE COURT:  Now, he has asked a very specific

16   question, which is that there is available to you, or maybe,

17   through various kinds of investigative techniques the

18   opportunity to retrieve even messages on instruments that are

19   destroyed.

20             MS. SIEGMANN:  There may be, but in this case I have

21   talked to the prosecution team in Tsarnaev, and the best text

22   message record we have is from the phones of the defendants,

23   which were produced in their entirety.  That is the text

24   message records on those phones that were not destroyed and

25   that we have obtained in this investigation.

1          THE COURT:  Have you made any efforts or the

2     prosecution team made any efforts to obtain from the providers

3     information?

4          MS. SIEGMANN:  I believe efforts were made, but that

5     they were unsuccessful, but I can confirm that with the

6     Tsarnaev team.  What I did confirm was that they had no other

7     text messages other than those that we produced in this case.

8          THE COURT:  So, you will provide to counsel your

9     response to the question of whether or not efforts were made to

10    recover by some means other than the destroyed instrument or

11    what you had from, I guess, the defendants' own instruments.

12         MS. SIEGMANN:  Yes, your Honor.  And, obviously, there

13    is very limited storage of these for text messages.  Providers

14    only usually keep them for a very, very short period of time,

15    and that's why they're very hard to come by if you don't have

16    the device.

17         THE COURT:  Well, we will see what that leads to.  You

18    will make an inquiry.  You will respond.  That is where that

19    stands.

20         With respect to third parties, I still do not

21    understand it.  Is there anything else to be said here?

22         MR. DEMISSIE:  Besides --

23         THE COURT:  I have read your materials.  It is not as

24    if I have not seen what you put in writing as to this issue,

25    but unless there is something I am missing here.

1          MR. DEMISSIE:  I think the reason why that was

2    included is just in case there is reference to these defendants

3    in communications with third parties, but I think if the

4    Government provides that information to us, then whatever is

5    available --

6          THE COURT:  That is a little bit different.  You want

7    to see whether or not there were any references to these

8    defendants in communications during that time period to

9    Mr. Tsarnaev by some third party?  Is that it?

10          MR. DEMISSIE:  That's correct.

11          THE COURT:  What is the answer to that?

12          MS. SIEGMANN:  I'm sorry.

13          THE COURT:  The question was raised or narrowly,

14    perhaps, by Mr. Demissie that what the defendants are looking

15    for here in third parties, it is not just any third-party

16    communication, but third-party communications that reference

17    these defendants, third-party communications with Mr. Tsarnaev

18    that reference these defendants.

19          MS. SIEGMANN:  I'm not aware of any of those.  Again,

20    I will inquire, and I have talked to the prosecution team for

21    Tsarnaev, and they don't have any other text messages that we

22    are aware of relating to anyone except the phones that we have

23    reviewed and produced with regards to the defendants.

24          THE COURT:  All right.  You will confirm that.

25          MS. SIEGMANN:  I'll confirm that as well, your Honor.

1    But, obviously, if there are any text messages relating to

2    Tsarnaev we will produce those, but I don't believe there are

3    any other than what we have produced.

4           THE COURT:  So, the answer to that is I do not see

5    anything here to compel.  The Government will, however, respond

6    with reference to whether or not there are other sources of

7    information that are provided, either statements of these

8    defendants in communication with Mr. Tsarnaev, or statements by

9    third parties referencing these defendants in connection with

10   communications with Mr. Tsarnaev.

11          So, then we go to, I believe, 14, which is handwritten

12   notes, recordings having to do with a variety of interviews.

13          Now, the short answer is this is premature, unless we

14   are dealing with Brady or Giglio materials.  The Government has

15   said it has provided all of the Brady-Giglio material that it

16   is aware of that it has concerning the universe of people who

17   are identified here, some of whom they say they never,

18   themselves, interviewed anyway.

19          But I do not why, first, this should jump the schedule

20   that has been established for the production of documents; and,

21   number two, how I can say that there is any Brady or Giglio

22   material at this point.

23          Again, I emphasize, and I am sure the Government

24   understands that I mean it when I say it, that if their

25   statements are inaccurate regarding this, that I will take

1    whatever steps are necessary to impose sanctions.

2            But right now that is what I am presented with.

3            So, what else?

4        MR. STAHL:  Your Honor, we understand, just as your

5    Honor said, that it is somewhat premature, and, obviously,

6    other than Brady-Giglio what we are talking about is perhaps a

7    semi-unique situation in that most of these students are

8    foreign college students, university students; and since we

9    have a time period to get ready and explore this, and since

10   many of them go home to their home countries during the summer,

11   we were asking for the Court to exercise its discretionary

12   authority so that we have early access to this so that we can

13   compare.  We gave one example.

14       THE COURT:  But, see, you would not have access to it

15   until they testified.  Our Local Rules advance this, and

16   apparently the Government is prepared to, in fact has, advanced

17   Jencks material earlier than they are required to already, and

18   they do not show any stomach for testing me on what 3500 means

19   in terms of when you have to disclose, that they are going to

20   disclose in accordance with the schedule that I have set.

21           So, you will get whatever you get from people who are

22   going to testify.  But people who are going to testify are

23   people who are not going home to their home country before they

24   testify.

25       MR. STAHL:  If they are on the Government's witness

1   list.

2          THE COURT:  Right.  But you have the same opportunity

3   they have, which is to go talk to them, or perhaps even seek

4   Rule 17 subpoenas for them.  This seems kind of a dragnet of

5   people of someone you might like to talk to, but I am not sure

6   that there is any requirement that the Government has to

7   provide this to you.

8          MR. STAHL:  I don't think there is a requirement at

9   this time.  We were positing it to the Court.  A good part of

10  the Government's initial part of the case is what occurred the

11  evening that the defendants are alleged to have gone to Jahar's

12  dorm room in Pine Dale Hall, who they spoke with, what their

13  actions were, what they did, and that's what we are focusing on

14  in particular.

15         But I understand your Honor's ruling.

16         THE COURT:  Well, I just do not see anything that

17  justifies my making a special order to compel on this, in light

18  of the Government's response, which at this stage I take as

19  truthful and accurate.

20         MR. WOOLDRIDGE:  Your Honor, just one question on

21  that.  There is one individual that was interviewed by the

22  Government.  She was an RA at the Pine Hall Dorm.  I don't know

23  if the Government is going to attempt to argue something.

24  There was a "terrorista" license plate on the defendant's car,

25  and my concern is that the Government may try and argue that

1   this is probative of the defendants' intent, that they support

2   terrorists because they have this "terrorista" license plate.

3       It's my understanding that the Government interviewed

4   this RA at the Pine Hall Dorm, and she informed the Government

5   that she was the one who gave the license plate to the

6   defendant and it had nothing to do with terrorism.  It was a

7   joke about there is a song called "Terrorista, Terrorista," and

8   that's what the license plate has to do with.

9       So, in requesting -- and I didn't receive any 302s on

10  this particular person or notes from the agent.  So, I think

11  that if the Government is going to try and bring up the

12  "terrorista" license plate, the interview of this individual is

13  material to the defense.

14      MS. SIEGMANN:  I hadn't heard that, your Honor.

15  During the conference this was never brought up.  I could have

16  told them that we have no intention of offering that evidence

17  at trial.

18      MR. WOOLDRIDGE:  Okay.

19      THE COURT:  So, nothing about license plates is going

20  to be offered at trial --

21      MR. WOOLDRIDGE:  Thank you.

22      THE COURT:  -- which seems prudent.

23      So, with respect to Requests 14 and 15, it seems to me

24  that there is nothing there for me to compel.

25      Turning to Request 16, which is names and addresses of

1    members of the Joint Terrorism Task Force and lists of persons

2    who participated and were present during the search, now, with

3    respect to presence during the search or participating, as I

4    understand it, that has been turned over.

5              MS. SIEGMANN:  Yes, your Honor, it has.

6              THE COURT:  So, now we are talking about names and

7    addresses of people of the Task Force.  I am not sure what

8    justification there is for that, in light of the fact that you

9    have the identification of who was present.

10             MR. STAHL:  Request 16 and a number that follow all go

11   towards what your Honor has previously stated, may become more

12   relevant during the suppression hearings.  Again, it's going

13   towards the dozens of officers who saw, who heard what, going

14   to the circumstances of whether any of the consents were freely

15   and voluntarily given, whether the defendants understood it.

16   Obviously, we are not talking heir home addresses.  We are

17   talking about the agencies involved.

18             The Government's position has been that would require

19   us to make a list, which would be civil interrogatory.

20   Certainly the members of the Joint Terrorism Task Force, the

21   agencies were known and who was present on, we are talking

22   about two or three days.

23             THE COURT:  Let's just deal with this step by step.

24   The Government has a series of responses, some, as a practical

25   matter, less compelling than others.  That they have to make up

1     a list does not bother me very much, except that they have

2     already given you the list of these people.

3              Number two, I assume that you would have to have a

4     good-faith basis for believing that one of these people is

5     going to testify differently than what you see in the 302.  So,

6     I do not know that we have anything other than there were a lot

7     of people observing, or could be said to have observed, or been

8     present at least during the time period that this took place.

9              MR. STAHL:  Judge, if I could just answer those first

10    two, so I don't lose track?

11             THE COURT:  Sure.

12             MR. STAHL:  One, we do not have a list.  We have a

13    list of who was present in the Carriage Drive address for the

14    search.  That's a much smaller list than the officers on the

15    scene.

16             THE COURT:  But that is who you are really interested

17    in, isn't it, the people who actually did the search or were

18    there for the consents?  I assume that there are consents, or

19    they say there are consents.

20             MS. SIEGMANN:  Yes, your Honor.

21             THE COURT:  Whether they are valid consents is another

22    issue.

23             MR. STAHL:  I don't know who was present for the

24    consent either, because we have 302s, and until recently we

25    just found out that there was Homeland Security agents involved

1   in even the interrogations.  They were never mentioned in the

2   FBI 302s.

3           THE COURT:  I think the representation of the

4   Government is that they were present, not that they were

5   involved in the interrogation.

6           MS. SIEGMANN:  Exactly, your Honor.  And, by the way,

7   in that 302, if you look at it, there was reference to that.  I

8   gave them another notice of it.

9           THE COURT:  I did read the Government's response.  The

10  suggestion that the Homeland Security people were not the

11  Government, they had better not pursue *that* line in the future.

12  They *are* the Government.  We don't even have to reach the

13  question of the Unitary Executive before we get to that one.

14          MR. STAHL:  Okay.  And as far as the officers that may

15  have overheard, your Honor said we must first show a good-faith

16  basis that someone might testify differently.  Before we could

17  even attempt the almost futile exercise of approaching law

18  enforcement and trying to interview them with our defense

19  investigators, which we all know what happens when that

20  happens, we need to know who they were.  So, I don't even know

21  the names of the New Bedford Police Officers or the

22  Massachusetts State Police that were around securing our

23  clients in the cars for several hours on April 19th that might

24  have overheard when Special Agent Walker --

25          THE COURT:  Why don't you have that with the logs and

1    all of the underlying material?

2         MS. SIEGMANN:  In fact, the names of the officers who

3    transported the defendants are on the logs, your Honor, that

4    were produced, and the consents were -- there were reports of

5    every time that the defendants consented.  There was five times

6    each of Kadyrbayev and Tazhayakov.  They also have a report of

7    who actually talked to them to get the consent.  So, they have

8    all the officers or agents that are relevant to their questions

9    of whether it was a valid consent, and they also have all of

10   the agents that participated in the searches.

11        THE COURT:  It just seems a fishing expedition.

12        MR. STAHL:  I apologize, but to me that's a glib

13   answer by the Government.  We found out just the other day

14   names of the people only because we keep pushing and asking.

15   Second, those New Bedford officers that transported, are those

16   the New Bedford officers that were present when the agent was

17   leaning in the car talking to them?  Were Massachusetts State

18   Police, who were just as actively involved in this case as the

19   FBI -- I at least would like the names and the agencies so that

20   I could have an investigator go try to talk to these

21   individuals.

22        THE COURT:  You just told me it is a futile exercise

23   to do that.

24        MR. STAHL:  It's only futile once I try it and it

25   doesn't work.

1           THE COURT:  But you have got the list of everybody who

2    is relevant here, truly relevant, not of people who were

3    hanging around.

4           MR. STAHL:  I'm talking about people that were

5    prescient witnesses that overheard.

6           THE COURT:  That is what all these people are that you

7    have got so far.  If I understand, you have not talked to them

8    yet or even tried to.

9           MR. STAHL:  We just got their names, Judge, Friday.

10          THE COURT:  If I may, that is not altogether true.

11   You have gotten 302s all along.  You have had the consents all

12   along.  All of this information has been provided to you.  Some

13   additional names were added to the list.

14          But I am not sure that there is anything here that has

15   been explored that would give justification for then trying to

16   find out who was milling about during the time of these

17   encounters.

18          The short of it is you are not entitled to it.  I am

19   trying to explore what you really need, and what you really

20   need depends on what you have done with what you have got, and,

21   as I understand it, you protest that it would be futile to talk

22   to law enforcement.  That may or may not be true.  I do not

23   know.  That is a different set of issues.  But you have not

24   even talked to the people who show up as being the truly

25   percipient witnesses in this process.

1          MR. STAHL:  Judge, the FBI is not going to consent to

2     an interview by defense.  They will testify on the stand.

3          But here is what I can do.  If I know that the

4     Massachusetts State Police Officers were present and overheard

5     certain things, all law enforcement officers -- I'm a former

6     law enforcement officer, a Detective Sergeant, a former federal

7     prosecutor -- you have to keep log entries and notebooks.  You

8     have to justify what you are doing on your time in writing

9     reports to your agency, that you're not just on a frolicking

10    detour for 24 hours.

11         So, I could subpoena them, as your Honor said.  But I

12    have to know the names of the officers.

13         THE COURT:  But there is something else, which is

14    there is no need to subpoena them because it is only relevant

15    to you if they will contradict what someone else has said, and

16    if they contradict then we have got a Brady-Giglio issue.  The

17    Government tells me that they do not have it.

18         Now, I want to be clear with the Government on this, I

19    think I have been, with the rather fine parsing of whether or

20    not someone from Homeland Security is part of the Government.

21    Everybody involved in this process is part of the Government

22    team, and the Government better have checked with every one of

23    them with respect to their statements and anything that they

24    have that might be contradictory.

25         Maybe I am going to be told otherwise, but I take it

1      that the Government has contacted everyone that they are aware

2      of who was part of the team.

3              MS. SIEGMANN:  That's correct, your Honor.  The papers

4      were very specific.  We didn't say Homeland Security

5      investigations were not part of the investigation, we said

6      "CIS."  There is the immigration, the deportation piece of this

7      that we were referring to.  The immigration officers --

8              THE COURT:  I view that as part of the Government in

9      this prosecution.  Trying to parse that out just does not work

10     for me.

11             MS. SIEGMANN:  We did, your Honor.

12             THE COURT:  Now, what I have understood you to have

13     said is that the A-File has been provided, and that is the only

14     documentation.

15             MS. SIEGMANN:  Yes.

16             THE COURT:  That is the answer.  But I do not want the

17     Government laboring under the misapprehension, which can turn

18     out to be very unpleasant, that they can say, This one is in,

19     this one is out.  Anybody who was involved in this ganglion of

20     concerns around this time period who is a government agent and

21     involved in the support of the investigation is part of it.

22             MS. SIEGMANN:  Just so it's clear for the record, the

23     Government has done a very thorough and careful, diligent

24     inspection for every relevant document in this case from all of

25     its partners in the JTTF, and there are no other notes or logs

1    from the State Police.  They have been produced.

2           Same thing for New Bedford.  There is nothing else to

3    identify anyone else involved, to identify anything

4    contradictory, because nothing contradictory to what has been

5    produced exists.

6           THE COURT:  So, that, it seems to me, is a full and

7    complete answer on this.

8           I cannot order, on the basis of what I have now, any

9    of this additional request that I find in Request No. 16.  And,

10   again, I will inquire, if pressed on this, what the defense has

11   done without -- and if you want to do that *ex parte* so that you

12   do not disclose defense initiatives, that is fine.  But it does

13   not do to say, "We have not talked to law enforcement people

14   because law enforcement will not talk to us, but we want the

15   names of some more law enforcement people," who presumably will

16   not talk to you.  That is contradictory.

17          Now I have this response with respect to specific

18   kinds of documentation.  The Government says it has done its

19   due diligence.  It understands that I have a rather capacious,

20   latitudinarian view of the universe of people that they are

21   supposed to be contacting here.  They tell me that they have

22   done that.  That is where we are.

23          MR. STAHL:  I appreciate that, and that is the first I

24   have heard from the Government that they have checked and asked

25   the officers for their notebooks and their handwritten notes

1    and looked through them, that there are no Giglio or Brady

2    materials.  And so, if the Government has done that, then

3    that's where we are right now, your Honor.

4         MS. SIEGMANN:  Your Honor, just for the record, there

5    has been a multiple of e-mails that I have sent to counsel

6    saying, "There's no notes of these people," "No notes of these

7    people," and today I'm hearing that we just produced things

8    last Friday.  We didn't produce anything Friday.  We produced

9    all of this stuff in response to their discovery.  There's

10   e-mails attached to their papers.  February 27th was when they

11   got the state logs, not last week.

12        Sorry.  It's just ridiculous.

13        MR. STAHL:  I apologize.  Ten days ago.  I wasn't

14   dissing the Government.

15        THE COURT:  I am less concerned about the history of

16   it.  Perhaps there is someone out there who is, but I am really

17   concerned with where we stand right now on the disclosure.

18   That is why I came out and said it is an iterative process, it

19   goes back and forth.  But right now I am dealing with those

20   things that the parties believe are still teed up for

21   determination.

22        Now I turn to Request No. 17, which has to do with all

23   handwritten notes and reports and so on.  I think that has been

24   covered so far in the responses.

25        MR. STAHL:  Yes, your Honor.

1          MR. WOOLDRIDGE:  That's correct.

2          THE COURT:  Request No. 18, which is log entries and

3     notes and so on, I think that has been covered so far in their

4     representation.

5          MR. WOOLDRIDGE:  Yes.

6          THE COURT:  I see a nod, but just so the record is

7     clear, hearing no objection to that, I will move on.

8          No. 19 is copies of written and typed statements

9     provided to the defendants to sign.  This is back to the

10    Kadyrbayev matter, I guess.

11         MR. STAHL:  Yes, your Honor.  When the time comes we

12    will submit our affidavits from our witnesses, and we will take

13    it from there.  Thank you.

14         THE COURT:  All right.

15         Then, No. 20 is documentation with respect to

16    interagency understandings in this; and No. 21 has to do with

17    the agents' beliefs that one or both of the Tsarnaev brothers

18    and/or explosive devices were present at the Carriage Drive

19    residence or any other grounds for invocation of the public

20    safety exception.

21         With respect to various kinds of rules or policies or

22    procedures, that is not something that is discoverable here.

23    It does not appear to be enforceable, in any event, before me.

24    And how the Government came to conduct its investigation in the

25    way that they did is not really relevant.  The focus, of

1    course, is on the defendants, not the Government here.

2           Similarly, their basis for believing that the Tsarnaev

3    brothers might be present or that explosive devices would be

4    present seem not to me to be particularly relevant or likely to

5    lead to anything relevant.

6           And as to the invocation of the public safety

7    exception, the Government says it is not going to invoke it.

8    It says it has it.  It is not going to invoke it.

9           So, the pre-Miranda statements are not coming in in

10   the case.  Now, we have talked about the possibility that this

11   will become relevant for purposes of showing lack of knowledge

12   or lack of consent, or maybe coercion, but that is not teed up

13   by any of this.

14          So, I do not see a basis for ordering disclosure here

15   of Requests No. 20 or 21.

16          Then we turn to 26 and 27.  These have to do with

17   predecisional materials by the Government having to do with

18   their tactics, I guess, in approaching the defendants, or at

19   least policies that have to do with those tactical

20   considerations and larger policies about invocation of the

21   public safety exception, or perhaps the two-stage process of

22   interviewing defendants.

23          Again, not relevant, not likely to lead to anything

24   relevant.  The question for me is how these particular

25   defendants responded under these circumstances, and this will

1    do nothing to advance a meaningful determination with respect

2    to that.

3          Again, apart from these requests, if there are

4    objections other than that that you want to articulate, I will,

5    of course, invite it.

6          With respect to Request No. 28, again, we are dealing

7    with procedures for interviewing suspects in a terrorism

8    investigation.  I am not concerned with their procedures.  I am

9    concerned with what they did in this particular case, and I do

10   not see a basis under our Rules or the Government rules

11   generally to turn that over.

12         Request No. 40 has to do with communications between

13   different law enforcement agencies in the investigation of the

14   defendants.  Apart from the kind of invocation of what the

15   rules provide, almost like a catechism here, there is no

16   meaningful argument about it.  It is not something that can be

17   turned over.  If it somehow would cast doubt on the credibility

18   or accuracy of any information, of course the Government has

19   that continuing obligation, but I do not see how it does here,

20   certainly not this level.

21         Number 42 has to do with Special Agent Dolan's

22   memorandum of August 7th.  There appears to be some dispute

23   arising from the deposition of a witness taken, I guess, under

24   Rule 15.  I have the representation from the Government that

25   there was no destruction of notes and that they have turned

1     over 19 pages?

2           MS. SIEGMANN:  Yes, your Honor.  Actually, I have a

3     copy of them, if you would like to see them.

4           THE COURT:  Not at this point.  The short of it is

5     maybe there will be a dispute about this.  I have read

6     Footnote 18 on Page 25 of the Government's response concerning

7     the witness's testimony, which seems "like kind of like" what

8     she was saying, and we will see whether that is compelling in

9     this form.  But at this stage I have a representation from the

10    Government with regard to the handwritten notes, and there does

11    not seem to be much else to do until there is some factual

12    basis for saying otherwise.

13          MR. DEMISSIE:  If I may be heard just briefly on that,

14    your Honor?

15          THE COURT:  Sure.

16          MR. DEMISSIE:  Your Honor, the footnote contains a

17    follow-up questioning by one of the lawyers during the

18    deposition.

19          THE COURT:  Right.

20          MR. DEMISSIE:  There was an affirmative statement by

21    the witness that her initial statement was ripped up or

22    destroyed by the officer.

23          THE COURT:  Well, let me just quote so that we are

24    clear on what the witness stayed:

25          "Yeah, like, I can't remember like exactly her

1    actions.  It was either like she ripped them or like she threw

2    them away.  It was like -- I think it was a notebook, so she --

3    it's just like -- she just, you know, start like saying that I

4    got to tell everything or she's going to arrest me, and she

5    just started rewriting everything again."

6              That's the testimony of the witness.  Now, there may

7    be additional testimony of the witness, and that may or may not

8    be compelling to me if I am put in a position of having to

9    evaluate the video.  I do not have the video, I do not the full

10   amount.  I have not heard from Agent Dolan to make a

11   determination.  This is, to some degree, like the allegations

12   that have to do with whether or not Mr. --

13             MR. STAHL:  Kadyrbayev.

14             THE COURT:  Kadyrbayev -- I hope by the time of trial

15   I do not have to keep looking to you to prompt me on this, but

16   I do have problems with names -- but Mr. Kadyrbayev's being

17   offered something to sign and then taking it back.  The

18   Government says it does not happen.  Agent Dolan says this did

19   not happen.  There is something of a dispute at least alluded

20   to, and if it is material I will have to resolve it.

21             MR. DEMISSIE:  I think what I am looking for is a

22   specific representation that the Government had asked Agent

23   Dolan and that she denied ripping up or throwing any statement.

24             MS. SIEGMANN:  Your Honor, Special Agent Dolan did not

25   destroy any notes during that interview, and that's exactly

1    what the papers say.  That's what we've inquired.  There is 19

2    pages of single-spaced, handwritten notes that actually appear

3    to be from a spiral notebook, just like the testimony of the

4    witness.

5         And this is not material.  Ms. Dolan is not going to

6    being testifying.  She's not a testifying agent.  She did not

7    interview the defendants.  She only interviewed this witness,

8    who --

9         THE COURT:  Well, I do not know that.  I have two

10   points to make about it, underscoring something which I have

11   said before, which is I am under-whelmed when people refer to

12   the number of pages of things.  It is what is in the pages that

13   are important.

14        Number two, it may be that after the testimony of the

15   deponent is presented, if it is presented, that one person or

16   another will want to rehabilitate or attack the deponent

17   through the use of testimony like this.

18        I understand the Government says it is not going to

19   offer Agent Dolan in its case in chief.  It may want to offer

20   her in some other context.  The defendants may want to offer

21   her.  But, in any event, at this stage I am not in a position

22   to say one way or the other, and, frankly, whether or not this

23   is, in fact, a factual dispute that I can resolve.

24        MR. DEMISSIE:  I'm only looking for the representation

25   from the Government.

1          THE COURT:  It has been made several times,

2    Mr. Demissie, I think.  I do not know how much sharper it could

3    be.

4          I will restate what I understand Ms. Siegmann to be

5    telling me, which is she made full inquiry of Ms. Dolan.

6    Ms. Dolan said she that destroyed nothing, she ripped nothing

7    up, and these are her notes and these are the notes that were

8    taken at the time.

9          MR. DEMISSIE:  I would be happy with that

10   representation.

11         MS. SIEGMANN:  I have made it several times to the

12   defense in the conference as well.

13         THE COURT:  Well, that is historical and, as I have

14   said, of marginal interest.  The point is right now you ratify

15   what I have just said; is that right?

16         MS. SIEGMANN:  Yes, your Honor.

17         THE COURT:  So, there we are.

18         So, then we go on to the names of all of the FBI

19   agents, this is No. 43, state troopers and investigators and

20   all interviewers and so on, whether or not listed on discovery

21   reports.  It is really overbroad as presently stated, but even

22   narrowing it down to the specifics of the defendants

23   themselves, I think it has been provided with respect to the

24   defendants themselves, and to the degree that it involves

25   something more it sounds to me like Jencks material.  So, I

1    think that deals with that request as well.

2           No. 51 is the exact time when the defendants were

3    advised of their right to contact the country's consulate, the

4    location where the advice took place, and the name of the law

5    enforcement officer who so advised.

6           Here, I guess, Ms. Siegmann, I am not sure I

7    understand precisely what the Government's response is on this

8    one.

9           MS. SIEGMANN:  I'm sorry.  The Government's response

10   with regards to -- the consul notification -- the defendants

11   were provided consular notification on April 20th.

12          THE COURT:  How does that take place?  What do you

13   have?  Do you have a document?

14          MS. SIEGMANN:  A document that was signed by both

15   defendants acknowledging that they wanted their consulate

16   notified.

17          THE COURT:  Is it dated?

18          MS. SIEGMANN:  It's dated April 20th.

19          THE COURT:  Is it timed?

20          MS. SIEGMANN:  There is no time on it.  Let's see if I

21   have it with me.  But it's dated April 20th.  The defendant

22   Tazhayakov was also notified.  He actually asked for the names

23   of the consulate, and during the course of the interview the

24   FBI Special Agent listed, wrote down the name of the consulate

25   and the phone numbers in New York.  He was then allowed to make

1   a call during the interview so he could talk to the consulate,

2   if he so chose, the consul.

3           THE COURT:  So, that would show up, be timed in some

4   fashion in the device that he was using?

5           MS. SIEGMANN:  The device, yes.  And, again, it

6   occurred during the course of the interview on April 19th.

7           THE COURT:  But there is a request for a particular

8   time.  I just want to understand what documents exist that

9   provide a time for this communication.

10          MS. SIEGMANN:  We will have to see if there is

11   actually a time on the phone that he used at the barracks as to

12   what time he placed the call.

13          THE COURT:  That was his phone, though?

14          MS. SIEGMANN:  No, I don't believe he used his phone,

15   because his phone service, his outgoing call service wasn't

16   working at that time.  I believe he only had the ability to

17   text at that time.  He was able to use the phone during the

18   course of the interview, actually.  He used it to look up

19   words.  There was a couple of words in the course of the

20   interview he didn't understand, so he actually looked up the

21   definitions.

22          THE COURT:  Well, I think they are entitled to

23   anything that you can find that is maintained by the

24   Government, by the police department that shows the timing.

25          MS. SIEGMANN:  The argument of the Government on this,

1   your Honor, is materiality, because they are seeking this

2   information under 16(a)(1)(E), and for that request then they

3   have to show materiality, a *prima facie* case showing

4   materiality.

5        Here, the First Circuit has clearly held in United

6   States versus Lee that even if the Government had failed to

7   provide consular notification, that there is no grounds of

8   suppression, that the remedy is not suppression of evidence.

9        THE COURT:  Would it go to the question of whether or

10  not someone was voluntary and knowing in making their

11  statements?  Of course it would.  So, while it is not a grounds

12  for suppression on its own, it is part of the gestalt that will

13  be considered, at least will be considered by me here.

14       MS. SIEGMANN:  And I would actually remind the Court

15  of the other information that was in our brief about the fact

16  that these defendants were well aware and had already consulted

17  with their consulate beginning in April.

18       THE COURT:  Again, I have this representation.  All I

19  am dealing with is what I am going to order you to turn over

20  here, and as to that I am simply going to order that you turn

21  over any information that is included in logs or any

22  documentation.

23       MS. SIEGMANN:  If there is any information regarding

24  that one call.

25       THE COURT:  If there is, concerning the contact with

1    the consul.

2         MR. STAHL:  Judge, I would just ask, since we are

3    talking about this, so no consular information or warnings were

4    giving to the defendants on April 19th, so we are talking about

5    just April 20th, if I understand?

6         THE COURT:  Whenever they were given.

7         MR. STAHL:  I'm asking if you would inquire of the

8    Government.  Ms. Siegmann just said "April 20th."  Is that the

9    first time that they were told by the Government of their right

10   to consul official, that's all.

11        MS. SIEGMANN:  Well, with regards to, again,

12   Mr. Kadyrbayev, actually he had actually texted and talked to

13   the consul even before they went into and he was actually asked

14   to come to the Barracks to be interviewed.  12:12 p.m., I

15   believe, is the timing as to when he actually --

16        THE COURT:  Just give me the dates again.

17        MS. SIEGMANN:  Oh April 19th, Mr. Kadyrbayev,

18   actually, and his mother had both spoken to the Kazakhstan

19   consul, and then with regards to Mr. Tazhayakov, he actually

20   texted his mother with the phone number for the Kazakhstan

21   consul before he talked to the FBI at 12:12 p.m. on April 19th.

22   They then talked to the FBI that evening.

23        THE COURT:  12:12 p.m. meaning just shortly after

24   noon?

25        MS. SIEGMANN:  Yes.  So, at approximately 7:00 p.m.

1      they went to the barracks.  So, hours before they were very

2      well aware of the consul.  They both had some type of

3      correspondence and calls with him and actually had done some

4      internet searches on April 17th, two days earlier, to try to

5      get the phone number for the consul during the Boston Marathon

6      bombing investigation.

7            On April 19th, Mr. Tazhayakov asked to speak to the

8      consul, and during the course of the FBI interview at the

9      barracks he was provided phone numbers, and he then tried to

10      contact the consul.  They then were given the --

11            THE COURT:  Just so I understand the timing here --

12            MS. SIEGMANN:  Sure.

13            THE COURT:  -- so he is in the barracks at 7:00?

14            MS. SIEGMANN:  I believe the Miranda form is signed at

15      7:41, is when they started the Miranda warnings.

16            THE COURT:  This is 7:41 on?

17            MS. SIEGMANN:  p.m. on April 19, so that his interview

18      started at about 7:45.  I believe it took four minutes to go

19      through the whole form with him and to waive his rights, and

20      then they proceeded to question him, and during the course of

21      that questioning is when he asked to speak to -- you know, "Can

22      I speak to the Kazakhstan consul?"

23            So, they then researched and the got the phone numbers

24      for him so he could make the call.  He left a message.  There

25      was no answer and did not speak to him on that occasion.

1          And then on April 20th, both after they were arrested,

2     the defendants were arrested on immigration charges,

3     immigration violations, they were then advised of their

4     consular notification on a form in which they both signed that

5     they would like their consul notified, and that's how the

6     consulate --

7          THE COURT:  All the documents that relate to that,

8     apart from any log documents in the barracks having to do with

9     the telephone call, have been provided?

10          MS. SIEGMANN:  Yes, your Honor.  The mention -- when I

11     was discussing the fact that the Internet history of the

12     defendant researching the phone numbers for the Kazakhstan

13     consulate office as well as the text messages between

14     Kadyrbayev and his mother talking about contacting them and

15     talking to the consul, all of those were on the defendants'

16     phone, Kadyrbayev's phone.

17          And then, similarly, we have records on

18     Mr. Tazhayakov's phone.  Sorry.  I actually have to think about

19     how to pronounce his name sometimes, like you.  And we saw at

20     12:12 p.m. that he texted his mother to give her the phone

21     number for the consulate.  So, these defendants were well aware

22     of how to contact and to talk to the consular.

23          THE COURT:  Well, the argument I am less interested in

24     right now, just the circumstances and the provision of all the

25     documentation that deals with this.

1          MR. STAHL:  My question was very narrow, Judge.  It

2     was whether a government agent said anything or provided any

3     form on April 19 to Mr. Kadyrbayev, and what I have heard now

4     is, "No."

5          THE COURT:  That is what I understand to be the case,

6     that he may have known something about it, but he was not

7     provided with the consular form until the 20th.

8          MR. WOOLDRIDGE:  That's what I wanted to know, your

9     Honor, just when they were informed by law enforcement about

10    consulate services, not -- it would be like somebody saying,

11    Hey, they were researching attorneys well before they were

12    advised of their right; just because they didn't get advised of

13    their right to an attorney they knew about it before, therefore

14    they didn't have to be advised.

15         THE COURT:  To the degree it is relevant, as I say,

16    for purposes of my understanding the larger gestalt.  That they

17    were aware on their own and took steps on their even is a fact

18    that I will take into consideration.

19         But, in any event, you have got the response to that,

20    the specifics of this question, so much of this question as is

21    relevant, and you are going to be provided with -- there will

22    be a search made of whatever phone records or logs are kept at

23    the -- I guess it is State Police Barracks in Dartmouth?

24         MS. SIEGMANN:  Yes, your Honor.

25         THE COURT:  -- concerning the telephone call that was

1   made by the defendant, which I broadly conceive as relevant

2   here, although apparently it was the next day that an actual

3   consular form was executed.

4        The question of destruction of notes and so on we

5   dealt with.

6        MR. DEMISSIE:  Just repeat it, your Honor.

7        THE COURT:  And then the opportunity to inspect and

8   measure and photograph the premises where the interrogation

9   took place, the Government has offered inspection.  I assume

10  that that inspection can include measurement, or not?

11       MS. SIEGMANN:  Your Honor, based upon the security

12  rules both at the FBI and the State Police Barracks, they have

13  objected to them measuring or photographing.  They are private

14  spaces.

15       THE COURT:  I understand that.  So, we will deal with

16  their recollections of what the size of the room is?

17       MS. SIEGMANN:  Yes, your Honor.  I can say that we

18  both have been to the rooms.  They are not small rooms, if that

19  was the contention of the defendants.

20       THE COURT:  Will you be testifying on behalf of them?

21       MS. SIEGMANN:  No, of course not, your Honor.

22       THE COURT:  I did not think so.

23       MS. SIEGMANN:  But the defendants, obviously, will be

24  able to testify as to the size of the rooms in which they were

25  interviewed and the officers that actually did the -- -

1          THE COURT:  What is the size of this room?

2          MS. SIEGMANN:  What is the size of this room?

3          THE COURT:  Yes, in feet.

4          MS. SIEGMANN:  In feet?

5          THE COURT:  Right.

6          MS. SIEGMANN:  From the back wall all the way down to

7     the paintings there?

8          THE COURT:  Right.

9          MS. SIEGMANN:  Sixty feet?

10                    (Pause)

11         MR. DEMISSIE:  I would say forty.

12         THE COURT:  So, why do we go through this?  You can

13    measure it.  They can see it, they can measure it.  So, they

14    will be permitted to measure it.  Photographing, no, not yet.

15         MR. DEMISSIE:  May I suggest a compromise regarding

16    the photographs, your Honor?

17         THE COURT:  Sketches?

18         MR. DEMISSIE:  No.  I was going to suggest that the

19    Government takes the pictures, and that they can be viewed by

20    your Honor *in camera* during the Motion to Suppress.

21         THE COURT:  Is there going to be a dispute?  The

22    posturing that is involved in all of this on the part of, what

23    will we call it, manner-and-means kinds of objections on the

24    part of the Massachusetts State Police and the FBI as to the

25    size of their rooms is absurd, from my perspective.  As a

1    security concern it is just silly.  Perhaps I understand.

2          But is there going to be a dispute about this?  They

3    were in a room that maybe was 60 feet or maybe 40 feet,

4    depending upon which one of you is doing the calculations in

5    your head, but without the use of a measuring tape.

6          MR. DEMISSIE:  No, I have not seen the room yet.  We

7    are scheduled to visit today.  However, your Honor, what I am

8    suggesting is that the Government can take the pictures, they

9    can be kept and be shown to your Honor *in camera*, and then they

10   can be published only to the jury at the time of trial.

11         THE COURT:  No, that does not happen.  Everything that

12   occurs in a trial, as far as I am concerned, except if we were

13   dealing with classified information, is going to be provided to

14   the general public.  The general public is entitled to know

15   what it is that a judge or a jury relies upon in making a

16   determination.

17         MR. DEMISSIE:  Your Honor, I'm only saying that

18   because they're saying it's a classified, secured --

19         MS. SIEGMANN:  I didn't say it was "classified."

20         MR. DEMISSIE:  I don't agree with that assessment.

21         THE COURT:  Nor do I think it is particularly

22   compelling.  But that having been said, it seems to me kind of

23   a waste of time to argue about it.

24         So, you take a look at it.  If you think that it

25   should be measured, you can come back.  If you think that there

1    should be photographs taken, you can come back.  I cannot

2    imagine that that is going to happen.

3              MR. DEMISSIE:  So, are we allowed to measure it now?

4              THE COURT:  Have you seen it yet?

5              MR. DEMISSIE:  We have not.

6              THE COURT:  So, my view is, it is one of those rules

7    of practice, is first the evidence, then the judgment.  You

8    have not developed the evidence yet to decide whether or not to

9    make a judgment about whether or not it has to be reduced to

10   some sort of printing, publication, photograph and that sort of

11   thing, and whoever is the matre d' of this location, there

12   might be a discussion with him that he is not in charge, or

13   she, of the Crown Jewels of law enforcement in the United

14   States, but sufficient to the day.

15             MR. DEMISSIE:  Then we come back?

16             THE COURT:  No.  Look first, and then maybe you come

17   back.  Maybe you will not have to come back.

18             MR. WOOLDRIDGE:  Your Honor, just one thing.  On the

19   photographs, one of the reasons why I wanted the photograph is

20   to be able to show my client and ask him, "Are these actually

21   the rooms that you were interviewed in?"  Because there is one

22   discrepancy in terms of what the Government has said and what

23   one of their own witnesses has said.  One of their own

24   witnesses said there was a camera in the interview room that

25   she was interviewed in.

1          THE COURT:  This is a State Police interview room?

2          MR. WOOLDRIDGE:  That's correct, your Honor.

3          THE COURT:  There should be one, because under state

4    law they are obligated --

5          MR. WOOLDRIDGE:  That's what I thought.

6          MS. SIEGMANN:  They weren't interviewed in the State

7    Police interview rooms.  They were interviewed in offices and

8    in a conference room, your Honor.  And that's what they all

9    see.  It's a conference room, a large conference room, where

10   Mr. Tazhayakov was actually interviewed.

11         THE COURT:  So, I am told that there is some

12   discrepancy here.

13         MR. WOOLDRIDGE:  What I'm saying, Judge, is the

14   Government's witness said that there was a camera in the room

15   that she was interviewed in.

16         THE COURT:  I am sorry.  "The Government's witness"?

17         MS. SIEGMANN:  He's referring to Ms. Kumisakli, the

18   girlfriend of Kadyrbayev.

19         MR. WOOLDRIDGE:  In the deposition, your Honor.

20         THE COURT:  So, she said when she was interviewed --

21         MR. WOOLDRIDGE:  There was a camera in the room.  And

22   the Government has said that there was no camera in the room or

23   was no cameras in any room.

24         My client also believes that there was a camera in his

25   room.  So, I would like to be able to show pictures of the room

1    to my client to ask if that was actually the room that he was

2    interviewed in.

3         MS. SIEGMANN:  Ms. Kumisakli, again, on the deposition

4    testimony during cross-examination, "Was there something that

5    looked like it could be a camera in the ceiling?"  There was

6    no -- I don't believe she was crystal clear about the fact

7    there was something up in the ceiling that could be a camera.

8         THE COURT:  This does it for me.  Photographs can be

9    taken by the Government.  They can be shown to me.  They can be

10   shown to the defendant so that the defendant can look at it.

11   Somebody in the Government, at the FBI or the Mass. State

12   Police is going to have to show some common sense on this.

13   This is ridiculous.

14        MR. WOOLDRIDGE:  Thank you, your Honor.

15        THE COURT:  So, you get to look at it.  Photographs

16   will be taken.  A photograph can be provided so that you can

17   show it to your client to say, "Is this the room?"  And it can

18   be provided to me, and maybe it will be used during the course

19   of the Motion to Suppress or trial.

20        Now, the next one has to do with various kinds of what

21   I guess is expertise and the development of expert reports and

22   so on.  I am not exactly sure what else you want.

23        Do you want the underlying materials that they looked

24   at or what?  I just do not understand what the defendants are

25   looking for here.  Is there something else?  You got the expert

1    reports, I guess.  I suppose an argument could be made that it

2    was not the backpack, although, frankly, the state of the

3    evidence seems pretty good for you right now.

4              MR. DEMISSIE:  Your Honor, this was narrowed down

5    through the discussion.  I think it was raised by one of the

6    co-defendant's attorneys.  But to the extent that the

7    Government is willing to allow us to inspect I think the actual

8    testing in the report, we are satisfied with that, at least

9    from my point of view.

10             THE COURT:  Well, I do not want to leave it uncertain.

11   What is the Government's understanding of what is going on

12   here?

13             MS. SIEGMANN:  The Government's understanding is that

14   during the course of the conference it appeared that one of the

15   counsel was unable to read the reports, so I explained what the

16   reports, the results of the tests were, and that was basically

17   that there was no latent prints of value found on the items

18   from Crapo Landfill, the backpack and the items.

19             Also, the DNA of the defendants were not found, again,

20   on the items from the Crapo Landfill, the items at issue, the

21   backpacks, the fireworks and those items; and, therefore, the

22   Government is not planning to use fingerprint or DNA analysis

23   on those items, and that's what the reports said.

24             And we have no problem, the Government has no problem

25   with and has offered to allow the defense to inspect those

1    items.  Those items, some of them, are still at Quantico.  The

2    only item currently in Boston is the laptop, Jahar Tsarnaev's

3    laptop.  We can make those available for them to see today, and

4    the other items will be shipped up to Boston before trial, and

5    they can inspect them at that time.

6              THE COURT:  I do not see anything here --

7              MR. DEMISSIE:  We are satisfied.

8              THE COURT:  -- that needs my order to advance

9    discussion.

10             So, I think I have been through all of the requests.

11   Are there any other matters that I have not touched on in the

12   Motion to Compel?

13             MR. STAHL:  No, your Honor.

14             THE COURT:  So, let us maybe review the bidding here.

15             With respect to Request No. 58, the Government will

16   provide the opportunity for the defendants to inspect, to

17   measure and to photograph the premises where the Government

18   says the interrogations of the defendants and potential

19   witnesses took place.

20             MS. SIEGMANN:  Your Honor, I thought the Government

21   was going to take the photographs.

22             THE COURT:  Oh, you can take the photographs.

23             MS. SIEGMANN:  And then today they would just inspect

24   and measure.

25             THE COURT:  Right.

1          MS. SIEGMANN:  Okay.

2          THE COURT:  Well, but it should be at the same time.

3    I would simply have someone taking the photographs today while

4    you are all there.

5          MS. SIEGMANN:  I will see if I can make those

6    arrangements.

7          THE COURT:  Oh, I bet the Government can find a

8    camera.  We put a man on the moon.  We can probably find a

9    camera for purposes of photographing.

10         And then that can be shown here.  Like all discovery,

11   it is not generally available here to anyone.  It only becomes

12   available if it is introduced or has to be introduced in

13   evidence at trial.

14         So, then we have the question of documents having to

15   do with the timing of the telephone call made by the defendant

16   Kadyrbayev.

17         MS. SIEGMANN:  No, actually, it's a phone call

18   of Tazhayakov.

19         THE COURT:  I am sorry.  Of Tazhayakov.

20         MR. WOOLDRIDGE:  But I believe the Government also

21   said that Kadyrbayev, there was a point in time where

22   Kadyrbayev made a call as well, or maybe I misunderstood.

23         MS. SIEGMANN:  No, there was no such phone call by

24   Mr. Kadyrbayev.

25         THE COURT:  So, in any event, the phone call will be

1    provided, the evidence and documentation that reflects when

2    that telephone was made.

3           It seems so long ago and far away.  Remind me of what

4    else was ordered.

5           MS. SIEGMANN:  There was one other issue, your Honor,

6    and that I was going to check, make an inquiry if there was any

7    other text messages of Mr. Tsarnaev involving either the

8    defendants or any conversations about the defendants with third

9    parties.

10          THE COURT:  Right.  I think that accurately reflects

11   what we have done here.

12          MR. STAHL:  I believe so, your Honor.

13          THE COURT:  Does that do it?

14          MR. WOOLDRIDGE:  That's good, your Honor.

15          THE COURT:  So, anything else we need to talk about?

16          MR. DEMISSIE:  Thank you, your Honor.

17          MS. SIEGMANN:  No, your Honor.

18          THE COURT:  So, we will see you -- I guess the next

19   time I see you is in May for the hearings.

20          I will tell you that, in order of hearing, the first

21   thing I will want to hear is any question about change of

22   venue, if the parties decide that they want to raise that

23   issue.  I want to get that dealt with at the very outset, but

24   that, it strikes me, is perhaps not very much evidence, but

25   maybe not.  In any event, we will deal with that first, and

1    then we will move on to -- as I understood, there was a

2    prospect of a Motion to Dismiss and a Motion to Suppress.  That

3    is the range of motions we are talking about, right?

4              MR. STAHL:  Yes, your Honor.

5              MR. DEMISSIE:  There is also a potential motion to

6    sever.

7              THE COURT:  Then, I would like to deal with change of

8    venue and severance right at the outset.  That will be the

9    order in which I will reach them.  I am not sure that is going

10   to make very much difference to you, because you will have

11   briefed all of those things before, but just so you know how I

12   think I am going to deal with this.

13             We will be in recess.

14             THE CLERK:  All rise.

15        (The Honorable Court exited the courtroom at 10:38 a.m.)

16             (WHEREUPON, the proceedings adjourned at 10:38 a.m.)

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Reporter

5     of the United States District Court, do hereby certify that the

6     foregoing transcript constitutes, to the best of my skill and

7     ability, a true and accurate transcription of my stenotype

8     notes taken in the matter of *United States v. Kadyrbayev, et*

9     *al*,  No. 1:13-cr-10238-DPW.

10

11

12

13

14    Date:  March 10, 2014            /s/ *Brenda K. Hancock*
                                       Brenda K. Hancock, RMR, CRR
15                                     Official Court Reporter

16

17

18

19

20

21

22

23

24

25