UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    Crim. No. 13-10238-DPW |
| DIAS KADYRBAYEV (1), | ) |
| AZAMAT TAZHAYAKOV (2), and | ) |
| ROBEL KIDANE PHILLIPOS (3), | ) |
| | ) |
| Defendants. | ) |

**OPPOSITION TO DEFENDANTS' MOTIONS FOR CHANGE OF VENUE
(DOC. NOS. 133, 134, 136) AND RESPONSE TO KADYRBAYEV'S MOTION TO
PERMIT JUROR QUESTIONNAIRES, INDIVIDUALIZED CASE-SPECIFIC VOIR
DIRE, AND ADDITIONAL PEREMPTORY CHALLENGES (DOC. NO. 131)[1]**

The government opposes the defendants' motions for change of venue because the

pretrial publicity in this case does not, by virtue of its extent or content, warrant the *presumption*

of prejudice urged by the defendants.  The defendants have fallen far short of the requisite

showing that publicity has, in essence, displaced the judicial process in this case.  The media

coverage in this case has been mostly factual, as opposed to inflammatory or sensational, thus

undermining any claim for a presumption of prejudice.  Further undermining the defendants'

request for a change of venue is the well-established judicial preference that highly-publicized

trials be held in metropolitan areas.

**I.    Factual Background:  The Record Regarding Pretrial Publicity**

The defendant description of the publicity in this case relies on material published in the

traditional media and on the internet.  Much of what the defendants cite is national and

international media coverage of the Marathon bombing, as opposed to coverage of the charges in

this case.  *See* Phillipos Mot., Ex. 1 (*CNN* online coverage of Marathon bombing); Ex. 3 (various

---

[1]As discussed below, at p.15, the government assents to the use of a case-specific jury
questionnaire, defers to the Court on whether individualized voir dire of the entire venire is
necessary, and objects to increasing the number of peremptory challenges.

articles discussing the bombing, the hunt for the bombers, and the apprehension of the bombers);
Ex. 5 (*USA Today* article discussing Marathon bombing anniversary).  Defendant Tazhayakov
exclusively cites national and international media, including Google searches, YouTube video
clips of the bombings, blog posts from a Washington, D.C. blogger, and Facebook posts from
KOCO 5 News, an Oklahoma City news affiliate.  *See* Tazhayakov Mot. at 7-8.  The material
cited by Tazhayakov is a combination of internet coverage of the Marathon bombing and of the
charges in this case.

Phillipos attaches 25 articles to his motion, five of which address the Marathon bombing
and 20 of which are in the nature of brief updates on this case.   The following is a list of the
articles specific to this case:

1. *Police: Tsarnaev's Friends Could have Saved MIT Officer's Life, WBZ News* (Ex. 2, 7)
2. *Friends of Dzhokar Tsarnaev to stand trial June 23, The Boston Globe* (Ex. 3)
3. *Dzhokar Tsarnaev's Friend Gets Indicted, Boston Magazine* (Ex. 3)
4. *Friends Alleged Tossed Out Items Linking Bombing Suspect to Explosions*, *Boston Magazine* (Ex. 3)
5. *Boston congressional hearing on bombings planned, Boston  Herald* (Ex. 3)
6. *Tsarnaev buddies arraigned in bombing case, Boston Herald* (Ex. 3)
7. *Three Friends of  Alleged Boston Bomber Plead Not Guilty, NPR* (Ex. 3)
8. *Friend of Boston bombing suspect gets arrested, supporters take to Twitter, New York Daily News* (Ex. 4)
9. *Suspected bomber's buddies guessed his guilt and shielded him anyway*, *The World News Group* (Ex. 4)
10. *Boston bombing suspect's friends plead not guilty, Associated Press* (Ex. 4)
11. *Robel Phillipos, Friend of Boston Bombing Suspect, Indicted,  Huffington Post* (Ex. 6)
12. *Tsarnaev friend asks judge to dismiss charges, The Boston Globe* (Ex. 6)
13. *House Arrest For Bombing Suspect's Friend Charged With Lying to FBI, WBZ News* (Ex. 3, 6)
14. *Judge orders release of teen accused of lying in Boston bombing investigation, Fox News* (Ex. 6)
15. *June Trial For Boston Marathon Suspect's Friends, WBZ News* (Ex. 7)
16. *Classmate Describes Arrest of Dzhokar Tsarnaev Friends As  Surreal WBZ News* (Ex.7)
17. *The Big Story: Texts, TV, then trouble for bombing suspect's pals, Associated Press* (Ex. 7)
18. *The Big Story: UMass: 1 arrested is suspended, 2 not enrolled, Associated Press* (Ex. 7)
19. *U.S. to pay legal fees of man in Boston bombing cover up"* Reuters (Ex. 8)
20. *Bomb suspected friend Robel Phillips: Who is he?, USA Today* (Ex. 8)

Each of the articles listed above is essentially factual in nature.  For example, Phillipos

cites a *WBZ News* article discussing all the defendants entitled *June Trial For Boston Marathon*

*Suspect's Friends*, which presents the following information regarding the allegations in this

case:

> Authorities say Kadyrbayev and Tazhayakov removed a laptop and
> backpack from Tsarneav's room at the University of
> Massachusetts-Dartmouth three days after the bombing.
>
> Phillipos is accused of lying to authorities. All three men have
> pleaded not guilty.
>
> The April 15 bombings killed three people and injured more than
> 260.

(Ex. 7).  Another example, *Tsarnaev's Friend's Could  Have Saved MIT Officer's Life*, presents

a timeline  of the events, according to the Criminal Complaint in this case, and states:

> On Thursday, April 18th, the FBI released photos of the suspected
> bombers at 5pm.
>
> A short time later, prosecutors say, friends of Dzhokar Tsarnaev
> removed a backpack with fireworks from his dorm room after
> seeing the photos.
>
> At 8:43 pm, the friends received texts from Tsarnaev.
>
> At 10:30 pm, MIT Police Officer Sean Collier was shot and killed.
>
> Two hours later, on Friday April 19th, around 12:41 am, Transit
> Police Officer Richard Donahue was wounded in gun battle with
> the Tsarnaevs.

*See also Friends Allegedly Tossed Out Items Linking Bombing Suspect to Explosions* (*Boston*

*Magazine*) (detailing allegations in Criminal Complaint).

Other local media coverage focuses on the judicial proceedings in this case.  *See Friends*

*of Tsarnaev to stand trial June 23* (*The Boston Globe*);  *Dzhokar Tsarnaev's Friend Gets*

*Indicted* (*Boston Herald*);  *Tsarnaev buddies arraigned in bombing case."*  (Exhibit 3).

Similarly, material cited by Tazhayakov is primarily factual.  *See, e.g.,* Tazhayakov Mot. at 8-9, quoting Patrick Howley, *New Boston suspects drove car with "Terrorista #1" license plate*, *The Daily Caller*, May 1, 2013, *at* http://dailycaller.com/2013/05/01/new-boston-suspects-drove-car-with-terrorista-1-license-plates (cited in the comment section to a YouTube video entitled *Terrorista #1 Suspects Arrested)* .   The *Daily Caller* article states in part:

> Two suspects who have been taken into custody in connection with the Boston Marathon bombings drove a car with "Terrorista #1" printed on the front plate.
>
> Azamat Tazhayakov and Dias Kadyrbayev were reportedly arrested, along with one other person, for allegedly making false statements  and conspiring to obstruct justice during the federal investigation into Boston Marathon bombing suspects Tamerlan and Dzhokhar [sic] Tsarnaev, official said Wednesday.

## II.     Argument

### A.  The Applicable Standard

It is axiomatic that "[T]he Sixth Amendment secures to a criminal defendant the right to trial by an impartial jury."  *Skilling v. United States*, 561 U.S. 358, 377 (2010).  The Supreme Court has explained that "[t]he theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Id*., (*quoting* P*atterson v. Colorado ex rel. Attorney General of Colo*., 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)) . "[A] change of venue may be granted if the court determines that there exists in the district 'so great a prejudice against the defendant that he cannot obtain a fair and impartial trial.'" *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir.1984) (*quoting United States v. Gullion*, 575 F.2d 26, 28 (1st Cir.1978)).  The First Circuit has explained that, in determining whether sufficient prejudice exists to require a change of venue, the two relevant inquiries are (1) whether jury prejudice should be presumed given the facts presented; and (2) if prejudice should not be

presumed, whether the jury was actually prejudiced.  *United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990).   In this case, as there is no direct evidence from which the Court could find actual prejudice, the defendants ask the Court to presume bias based on the publicity this case has received.[2]

The First Circuit has further instructed that, for pretrial publicity to require a presumption of prejudice,[3] the defendant must show that "prejudicial, inflammatory publicity about [a] case so saturated the community from which [the defendant's] jury was drawn as to render it virtually impossible to obtain an impartial jury."  *Id.*  "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature.  If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice."  *Id.* (*citing Murphy v. Florida*, 421 U.S. 794, 802 (1975)); *United States v. Medina*, 761 F.2d 12, 19 (1st Cir. 1985);   *United States v. McNeill*, 728 F.2d 5, 9 (1st Cir. 1985); *Harris v. Pulley*, 885 F.2d  1354, 1362 (9th Cir. 1989).

The presumed prejudice principle is rarely applied and is reserved for extreme situations. *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 551-54 (1976); *Harris v. Pulley*, 885 F.2d at 1361; *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980).  In order to apply the principle, the Court must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial.  *United States v. McVeigh*, 153 F.3d

---

[2]A showing of actual prejudice "typically requires direct evidence of bias, such as voir dire responses or survey data.  *United States v. Houlihan,* 926 F. Supp 14 (D. Mass 1996) (Gertner, J.) (*citing Irvin v. Dowd*, 366 U.S. 717, 728 (1961)).

[3]As defendant Tazhayakov correctly notes (Def. Mot. at 12), it is premature to address whether prejudice may be shown based on statements by members of the venire.  *See Angiulo*, 897 F.2d at 1181-82 ("A second factor that could support a presumption of prejudice is a more indirect measure that looks at the length to which the trial court must go in order to select jurors who appear to be impartial.  . . .  Where a high percentage of the venire admits to a disqualifying prejudice, a court may properly question the remaining jurors' avowals of impartiality, and choose to presume prejudice.") (citation and internal quotations omitted).

1166, 1181 (10th Cir. 1998) (*citing Sheppard v. Maxwell*, 384 U.S. 333, 342-45 (1966)).  In fact, it has generally been found only in cases "wherein the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom, transforming the trial into an event akin to a three-ring circus." *United States v. Capo*, 595 F.2d 1086, 1090-91 (5th Cir. 1980).

To make such a showing, the defendant must establish that "an irrepressibly hostile attitude pervaded the community." *McVeigh*, 153 F.3d at 1182 (*quoting United States v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991)).  The defendant, therefore, bears a heavy burden in seeking to establish that a presumption of prejudice exists in this case.  *McVeigh*, 153 F.3d at 1181.

### B.  Metropolitan Areas Are a Preferred Venue

While this case has received local and national press coverage, there is no reason to doubt that the Court can empanel a fair and impartial jury drawn from the Eastern Massachusetts.  In considering claims of presumptive prejudice, the Supreme Court has emphasized "the size and characteristics of the community in which the crime occurred."  *Skilling*, 561 U.S. at 381.

> In *Rideau*, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. App. 627a. Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain. S*ee Mu'Min v. Virginia*, 500 U.S. 415, 429, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (potential for prejudice mitigated by the size of the "metropolitan Washington [D.C.] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year"); *Gentile v. State Bar of Nev*., 501 U.S. 1030, 1044, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).

*Id.*

According to the 2010 United States census, 4,924,916 people in the nine counties in Eastern Massachusetts from which this Court draws jurors.  *See* U.S. Census Bureau 2010

Census.  As in *Skilling*, there is little reason to *presume* that the Court will not be able to empanel

a fair and impartial jury cannot be drawn from this jury pool, which is larger than the jury pool in

*Skilling*.  Other courts have long held that in large metropolitan areas prejudicial publicity is less

likely to endanger a defendant's right to a fair trial.  *Columbia Broadcasting Systems v. U.S.*

*District Court for the Central District of California*, 729 F.2d 1174, 1181 (9th Cir. 1984).  The

size and heterogeneity of a place like Boston and its suburbs makes it unlikely that even the most

sensational case will become a "cause celebre."  *See Estes v. Texas*, 381 U.S. 532, 545 (1965);

*see Associated Press v. United States District Court*, 705 F.2d 1143, 1146 (9th Cir. 1983)(Los

Angeles); *People v. Manson*, 61 Cal. App. 3d 102, 189-90 (1976)(same); *Commonwealth v.*

*Hoss*, 283 A.2d 58 (1971)(Philadelphia).

     In *Columbia Broadcasting Systems*, for example, the Ninth Circuit explained that, a large

metropolitan area is generally well suited for highly publicized trials:

> [I]n a populous metropolitan area, the pool of potential jurors is so
> large that even in cases attracting extensive and inflammatory
> publicity, it is usually possible to find an adequate number of
> untainted jurors.  The case of former Attorney General John
> Mitchell, for instance, was very heavily publicized in Washington,
> D.C., where the trial was held, and a private study conducted by
> Mr. Mitchell's attorney's revealed that 84% of those who had heard
> of the case thought Mr. Mitchell guilty.  Yet, Mr. Mitchell was
> eventually acquitted.

*Columbia Broadcasting Systems, Inc.,* 729 F.2d at 1181 (citation omitted).

     In affirming the denial of a change of venue from the Southern District of New York in a

case where there had been significant and damaging press linking the defendant to the "mafia,"

the Second Circuit stated: "We add the counsel of experience that transfer from a metropolitan

area to a smaller city may result in more rather than less intensive publicity."  *United States v.*

*Dioguardi*, 428 F.2d 1033, 1039 (2d Cir. 1970).   Similarly, in the Roy Cohn case, the court

denied motions for a continuance and a transfer of venue from the Southern District of New

York in a case where the defendant received "vast" publicity, stating:

> To remove the trial of a highly publicized case . . . to a small
> community outside of the City of New York would tend to focus
> the spotlight more brightly upon the case.  Modern means of news
> communication have taken away many of the reasons for the
> transfer of the cause celebre which may have existed fifty years
> ago.

*Application of Cohn*, 332 F.2d 976, 977 (2d Cir. 1964).

Likewise, this Court, in *United States v. Houlihan*, 926 F.Supp. 14 (D. Mass. 1996)

(Gertner, J.), denied a motion for a change of venue based upon presumed prejudice in one of the

celebrated "Code of Silence" prosecutions, stating,

> . . . presumptively prejudicial publicity necessitating a change in
> venue has been found in state cases where the venire is drawn from
> small geographical areas more readily saturated with prejudicial
> publicity.  It is more rarely required in federal court where the
> district draws from a larger area, here, Eastern Massachusetts.

*Id.* at 16, n.1.

Indeed, several highly publicized cases indicate that, even when exposed to heavy and

widespread publicity, many if not all potential jurors are untainted by press coverage.  As the

district court stated in denying a motion to transfer venue in the Oliver North trial, "[e]xperience

. . . with high profile cases engendering publicity such as Watergate, the prosecution of officials

of the current administration and in other situations strongly suggest that a completely impartial

jury can be seated." *United States v. North*, 713 F. Supp. 1444, 1444 (D.D.C. 1989); *see also*

*United States v. Mitchell*, 551 F.2d 1252, 1262 n. 46 (D.C. Cir. 1976)(despite the most pervasive

publicity accorded to any trial in American history, "without undue effort, it would be possible to

empanel a jury whose members had never even heard the [Watergate] tapes");  *United States v.*

*Myers*, 635 F.2d 945, 948 (2d Cir. 1980)(in one of the Abscam prosecutions the court found that

despite concentrated media coverage, "only about one-half of the prospective jurors indicated

that they had ever heard of Abscam . . . [and of those] only eight or ten had 'anything more than a most generalized kind of recollection what it was all about.'")(*quoting* trial transcript).

In the Oklahoma City bombing case, the prosecution of Timothy McVeigh was initially transferred from Oklahoma City to Denver, "a large metropolitan area where a 'large jury pool is available.'" *McVeigh,* 153 F.3d at 1180 (*quoting United States v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D.Okla. 1996).  The bombing itself, which resulted in the deaths of 168 people including nineteen children, was ubiquitously and nationally reported on television, radio, and in print.  During the course of jury selection in Denver, the media reported that McVeigh had confessed to his attorneys.  In addressing McVeigh's motion for a change of venue based upon presumed prejudice, the Tenth Circuit noted that:

> Indeed, despite the proliferation of the news media and its technology, the Supreme Court has not found a single case of presumed prejudice in this country since the watershed case of *Sheppard.* . . .  [T]he pretrial publicity of which McVeigh complains in this case did not "manifest [] itself so as to corrupt due process."

*McVeigh*, 153 F.3d at 1182-83 (citation omitted).

### C.  A Change of Venue Is Not Warranted By The Size or Characteristics of The Jury Pool Or By The Media Coverage In This Case.

The defendant's venue arguments are fatally flawed by their failure to distinguish between local media coverage -- which must be the focus of any media-based claim of prejudice -- and national media coverage of this case.  The relevant community for the purposes of venue is the community from which the jury will be drawn:  Eastern Massachusetts.  Most of what the defendants seek to characterize as sensational or inflammatory media coverage is material published in the national media or on the internet.   Aside from the greater likelihood that a local community will pay greater attention to local events, there is no basis to conclude that such coverage had a substantially greater impact on this venue than on any other.

9

Moreover, the defendants' arguments do little to distinguish between media coverage of the prosecution Tsarnaev for the Marathon bombing and media coverage of these defendants for obstruction of justice and false statements.  While an argument for a change of venue in the Tsarnaev case would also lack merit, it bears noting that the media coverage of the proceedings in this case pale in comparison to the Tsarnaev prosecution.  Moreover, a juror of reasonable intelligence, properly instructed, will have no difficulty distinguishing between the allegations at issue here and the Marathon bombing.

Finally, for the other reasons discussed above – the media coverage has been essentially factual and Eastern Massachusetts, as a venue, has the virtue of being a large metropolitan area, a change of venue is unwarranted.

### D.  Cases Upon Which Defendants Rely Are Inapposite

The great weight of authority thus recognizes that federal courts handling high profile cases in metropolitan areas can empanel fair and impartial juries.  Rather than address these cases, the defendants rely on watershed cases that bear little resemblance to this case, such as *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Irvin v. Dowd*, 366 U.S. 717 (1961).  The Supreme Court's recent treatment of these cases makes clear that they are not comparable to this case.  The Court's recent discussion of *Rideau* is instructive:

> Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.

> We reversed. What the people [in the community] saw on their television sets, we observed, was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and

murder.  [T]o the tens of thousands of people who saw and heard it, we explained, the interrogation in a very real sense *was* Rideau's trial—at which he pleaded guilty.  We therefore d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire, that "[t]he kangaroo court proceedings" trailing the televised confession violated due process.

*Skilling*, 561 U.S. at 379 (emphasis in original) (cites and internal quotations omitted).

In *Irvin*, the defendant was accused of the murder of six members of a family, crimes which became a *cause celebre* in a small Indiana community.  *Irvin*, 366 U.S. at 725 (emphasis in original).  The crimes, extensively covered by the local press, aroused great excitement and indignation in the county where they occurred, and in the adjacent county of 30,000 people where the trial was held.  *Id.* at 719.   Shortly after the defendant's arrest, the local prosecutor and police issued highly publicized press releases, stating that the defendant had confessed to the six murders.  *Id.* at 719-20.  Additionally, a barrage of newspaper headlines, articles, cartoons and pictures was released against the defendant during the six or seven months preceding the trial.  *Id.* at 725.  Further, eight of the twelve jurors selected thought that the defendant was guilty in advance of trial.  The Supreme Court concluded that the record in *Irvin* showed a pattern of deep and bitter prejudice had existed in the community and that a clear nexus existed between the community prejudice and the possibility of juror prejudice.  *Id*. at 727.  Accordingly, the Court reversed and remanded for a new trial.

In *Sheppard*, which involved the prosecution of Dr. Sam Sheppard for the murder of his pregnant wife, newspaper articles and editorials excoriated the defendant as a murderer and called for him to be taken to jail immediately.  For example, newspaper editorials with headlines such as "Why Isn't Sam Sheppard in Jail?" and "Quit Stalling--Bring Him In" assumed the defendant's guilt and contributed to the pervasive prejudice of the proceedings.  *Sheppard*, 384 U.S. at 341.  The media not only orchestrated public denunciation of the defendant but also was allowed to interfere with the trial itself. *See id*. at 342-43. "[N]ewsmen took over practically the

entire courtroom, hounding most of the participants in the trial, especially Sheppard." *Id.*

Reporters were even allowed to sit inside the bar of the court, making confidential exchanges

between the defendant and his counsel almost impossible during the proceedings. *Id.* at 343.

Moreover, the witnesses, counsel and jurors were photographed and televised whenever they

entered or left the courtroom. *Id*. at 343-44.  The Supreme Court found that "bedlam reigned at

the courthouse," *Id.* at 355, and that the trial court's failure "to control disruptive influences in the

courtroom*," Id.* at 363, required reversal.

Although this line of cases forms the fundamental jurisprudence against which most

recent cases are tested, they bear no resemblance to this case.

> E.     **A Thorough And Careful Voir Dire Is Sufficient To Provide The Defendant With A Fair And Impartial Jury.**

It is well-established that a thorough voir dire examination of potential jurors is a

sufficient device to eliminate from jury service those so affected by pretrial publicity that they

cannot fairly decide issues of guilt or innocence. *Patton v. Yount*, 467 U.S. 1025, 1038, n.13

(1984); *see United States v. Chapdelaine*, 989 F.2d 28, 31-32 (1st Cir. 1993) ("voir dire did not

in this instance reflect a 'pattern of deep and bitter prejudice'"); *United States v. Volpe*, 42 F.

Supp.2d 204, 218 (E.D.N.Y. 1999) (police brutality case involving sexual assault of Abner

Louima); *United States v. Helmsley*, 733 F. Supp. 600, 609 (S.D.N.Y. 1989) (highly-publicized

prosecution of real estate developer Leona Helmsley for tax fraud); *United States v. Salameh*,

1993 WL 364486 (S.D.N.Y. Sept. 15, 1993)(first World Trade Center bombing case); *United

States v. Yousef*, 1997 WL 411596 (S.D.N.Y. July 18, 1997) (second World Trade Center

bombing case); *United States v. Livoti*, 8 F. Supp.2d 246, 249 (S.D.N.Y. 1998) (high-profile

police brutality case).  As the Ninth Circuit noted in language directly applicable here:

> In a large metropolitan area such as Los Angeles, with its millions
> of potential jurors, it is unlikely that searching questions of
> prospective jurors . . . to screen out those with fixed opinions as to

12

> guilt or innocence and 'the use of emphatic and clear instructions
> on the sworn duty of each juror to decide the issues only on
> evidence presented in open court,' will fail to produce an unbiased
> jury . . .

*Associated Press*, 705 F.2d at 1146 (discussing pretrial publicity in the John DeLorean prosecution)(citation omitted); *Application of Cohn*, 332 F.2d at 977 (potential jurors presumed to give true answers to voir dire questions regarding prejudices or lack thereof).  Questionnaires tailored to the facts of this case will also eliminate jurors who cannot be fair and impartial. *Maldonado-Rivera*, 922 F.2d 934, 971 (2d Cir. 1990); *Angiulo,* 897 F.2d at 1183.  Further, if publicity increases as the trial approaches and during the trial, the Court may adequately protect the jurors from such publicity by taking certain measures, including admonitions to the jury to avoid exposure to news media reports, inquiries to determine whether any jurors received extrinsic information about the trial, and, if necessary, sequestration.  *See United States v. Rodriguez-Cardona*, 924 F.2d at 1158.

That this case has received pretrial publicity does not mean that a fair and impartial jury cannot be empaneled in this district.  "Prominence does not necessarily produce prejudice, and jury *impartiality*, [the Supreme Court has] reiterated, does not require *ignorance."  Skilling*, 561 U.S. at 381; *see also, Nebraska Press Association*, 427 U.S. at 554 ("pretrial publicity -- even pervasive, adverse publicity -- does not inevitably lead to an unfair trial").

In *United States v. Medina*, 761 F.2d 12 (1st Cir. 1985), the First Circuit addressed the issue of adverse pre-trial publicity in a case where there were over two hundred newspaper articles most of which mentioned the defendant by name. *Id.* at 18.  The Court recognized that "[t]he realities of life must . . . be taken into consideration" in connection with the right to a trial by impartial jurors. *Id.*  Quoting from the Supreme Court's decision in *Irvin*, the First Circuit stated,

It is not required, however, that the jurors be totally ignorant of the
facts and issues involved.  In these days of swift, widespread and
diverse methods of communication, an important case can be
expected to arouse the interest of the public in the vicinity, and
scarcely any of those best qualified to serve as jurors will not have
formed some impression or opinion as to the merits of the case.
This is particularly true in criminal cases.

*Id.*

As the court in *Medina* explained, "[m]ere juror exposure to news accounts of the crime
with which defendant is charged does not presumptively deprive him of due process." *Medina*,
761 F.2d at 19 (citing *Murphy,* 421 U.S. at 799).   In *Murphy*, the Court held that a defendant
invoking a violation of his Sixth Amendment right must demonstrate that "the setting of the trial
was inherently prejudicial or the jury-selection process of which he complains permits an
inference of actual prejudice."  421 U.S. at 803.  Relying on *Murphy*, the First Circuit in *Medina*
concluded that, alone, "extensive knowledge in the community of either the crimes or the
putative criminal" is insufficient to render a trial constitutionally unfair to the defendant.
*Medina*, 761 F.2d at 19.

So too, in *Angiulo*, the First Circuit found that the voluminous press coverage was not "so
inflammatory or sensational as to require a presumption of prejudice."  897 F.2d at 1181.  The
Court stated that prejudice should only be presumed where the prejudicial, inflammatory
publicity about a case so saturated the community from which the jury was drawn to render it
virtually impossible to obtain an impartial jury.  *Id.*  Further, the Court noted that if the media
coverage is factual as opposed to inflammatory or sensational, any claim for a presumption of
prejudice is undermined.  *Id.*   The defendant must show the "actual existence of a present
predisposition against defendants for the crimes currently charged."  *Angiulo*, 897 F.2d at 1182,
citing *Murphy*, 421 U.S. at 800 & n.4.  As such, Federal Rule of Criminal Procedure 21(a) states

that a court may grant a change of venue only if it "determines that there exists in the district 'so great a prejudice against the defendant that he cannot obtain a fair and impartial trial.'"

Finally, there is no evidence in the record to show that an impartial jury cannot be selected following careful voir dire questioning.  *Chapin*, 515 F.2d at 1285-86; *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) ("if an impartial jury actually cannot be selected, that fact should become evident at voir dire"); *United States v. Sinclair*, 424 F. Supp. 719, 720 (D. Del. 1976) ("in the absence of extraordinary circumstances . . ., the decision to change venue should await the voir dire of the veniremen"); *United States v. McDonald*, 740 F. Supp. 757, 761 (D. Alaska 1990)("[a]ny attempt to measure the prejudicial effect of publicity on prospective jurors prior to voir dire would be merely speculative").

F.  **ADDITIONAL PEREMPTORY CHALLENGES ARE UNNECESSARY**

Defendant Kadyrbayev seeks additional peremptory challenges based solely on the assumption that the defendants will be tried together and will share a combined total of ten peremptory challenges.  However, the government does not intend to oppose the defendants' motions for severance for reasons the government will explain in its response to those motions. Therefore, additional peremptory challenges are not warranted.

With regard to the Kadyrbayev's request for individualized voir dire, the government defers to the Court.  The government agrees that jury questionnaires are appropriate.

### III.    Conclusion

For the foregoing reasons, the Court should deny the defendants' motions for change of

venue and should deny Kadyrbayev's request for individualized voir dire.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ *John A. Capin*
_____
JOHN A. CAPIN
B. STEPHANIE SIEGMANN
Assistant U.S. Attorneys

<u>Certificate of Service</u>

I hereby certify that I caused the above document to be served on counsel of record for
the defendants by e-mail and first class mail this 2nd day of May, 2014.

/s/ John A. Capin
_____
JOHN A. CAPIN